31942.  STANLEY *v.* ELLIS.

Decided April 29, 1948.

*D. W. Mitchell, Walter H. Bolling,* for plaintiff in error.
*C. H. Dalton,* contra.

Felton, J. ▮ The defendant urges that the court erred in overruling his motion for a new trial, since the plaintiff made no demand on him for the automobile. In his answer, the defendant admitted possession of the automobile. "In a trover case, demand and refusal are necessary only as evidence of conversion, and need not be proved where conversion is otherwise shown." *Hicks* v. *Moyer,* 10 *Ga. App.* 488 (4) (73 S. E. 754) ; *Merchants*

& *Miners Transportation Co.* v. *Moore,* 124 *Ga.* 482 (52 S. E. 802); *Securities Trust Co.* v. *Marshall,* 30 *Ga. App.* 379 (118 S. E. 478). And it is not necessary to prove conversion of the property where the defendant is in possession when the action is brought, and in his answer denies the allegations of the plaintiff's title. Code, § 107-101; *Scarboro* v. *Goethe,* 118 *Ga.* 543 (45 S. E. 413).

■ The only question remaining for determination is whether or not there was any evidence to authorize the verdict for the plaintiff. Leonard Durham testified that he sold the plaintiff the automobile in question on October 7, 1946, and further stated: "I was working with Earl and Chester down at the cab stand during the time the car was changing hands. Yes, I have seen Earl driving the car. As to how Earl got hold of the car; well, the only thing I know, Mr. Ellis sold the car to him, sold this car to Earl Ellis. I wasn't there when the trade was made, or anything. I head Mr. Ellis say he had sold it to Earl Ellis. I don't know about the trade, I don't know what kind of a trade they made. I don't know the details of the sale, but he was driving it. When I was asked a while ago if Mr. Ellis told me he sold it to Earl Ellis and I shook my head 'yes'; well, I believe he did tell me that . . as to whether or not he ever delivered the car to Earl Ellis, or whether Earl Ellis ever had the car to my knowledge; well, he just drove it on the taxi line; I don't know how it was. . . As to whether or not Earl Ellis ever carried this particular car away from there to keep; well, I don't know about that. The best I can remember the car was there practically all the time." A second witness, Albert Hodge, attorney at law, testified that on November 3, 1946, he had adjusted an insurance claim with Chester Ellis concerning an accident in which the automobile in question in the present case had been involved.

Chester Ellis testified in part: "I never sold it to him; we did have a verbal agreement just between the two of us, but as far as surrendering the automobile to him, I never at no time surrendered the title to him. As to what my verbal agreement consisted of with Earl Ellis; well, at the time I traded with Durham, I had three or four cars down there, pretty hard to get drivers, unless you got them kindly obligated, so they would stay, always knocking down everything. Earl, he hung around for about a

week, driving other cars, so one day I went to the show, I had priced the car to a number of comers and goers I had been talking to, but I believe it was on Friday I went to the show; when I come out the phone boy then in charge of the lot, he told me Earl had been there, and when he come back he said, yes, been up to see one of his houses, going to come back and buy the car, I believe he offered to pay me for the trip, but anyhow then the following day he come up with a check for $600; that was on Saturday, I am pretty sure, since the banks was closed; he told me he would have to go to Ellijay, somewhere, to get the rest of the money; if I would accept the check for a portion of the money to secure the car while he was gone over there, he would drive the car, so I took the check. . . I believe I did at the time give him a receipt. [A receipt from Chester Ellis to Earl Ellis for $600 as partial payment on a Dodge taxi, bearing date of October 12, 1946, was introduced in evidence.] So, Monday comes and he didn't come around with anything. About Wednesday of that week may be, I think Tuesday or Wednesday, I got a call to come up to the bank; I went up; Mr. Jones told me this boy wanted to mortgage the car again. Mr. Jones said the motor number is wrong; he said so far my credit was limitless; this boy had a note running there; I would have to sign any note he took, he told me that in Earl's presence. . . I didn't sign the mortgage which he had left with the bank already drawn up. . . I signed the note. . . I guess thirty days later, I never got the money, in the meantime a little misunderstanding come up, I told him, you just as well take your money and let me have the car back, you will wreck the car running around, lose more than you get out of it, since you couldn't get up the rest; he told me, no. I says, I will give you a few more days, he took the car. I had occasion to be down at National Discount, had a wreck in a car, the boy was in Virginia, was down talking to Mr. Smith; he told me he had a loan on this particular car; Mr. Smith brought my attention to it; asked was I related to him; I smelled a mouse; I told Mr. Smith that was my car, the boy had no title to it; I went right at that time parked the car, sitting by the side of the house, sit there 30 days until he could get up the money, straighten up with National Discount. I went up in Virginia; [he] called me long distance he had straightened up with them, so I told my wife

to surrender the keys to him. . . . I did not make a bill of sale to him for the car; the car was in my possession at all times. . . *At the time this mortgage was placed with National Discount Company, I did not know anything about that, on the part of Earl Ellis and National Discount Company. At that time as to whether or not Earl Ellis had this car other than operating it from the stand; well, no sir, I had taken the car off, parked it in the lot. I did not give Earl Ellis any right to go down and put a mortgage on my car with the National Discount Company or the First National Bank.*"

Earl Ellis testified in part: "With reference to this transaction; well, on the 11th of October, 1946, I went down and talked to Chester about buying this car, Chester told me to come back down the next morning, so on the following day, the 12th, I went down there; Chester and I talked about it; I left and I went up and seen Mr. Dean Smith, up at National Discount, I went back down and talked to Chester and he told me if I would get $600 we would make a trade until Monday, until the bank opened, so I went back up and Dean gave me a check for $600; I went straight back down, paid him the $600, which I have a receipt for, which was October 12, 1946, and I drove the cab; that was Saturday; I drove it Saturday, Sunday, and Monday. . . *I didn't drive the car until Saturday morning.* No, I wasn't working there on the taxi line. I never had worked there for him, I worked for Floyd Hooper, which was a good while back; after he bought Floyd Hooper out, I didn't work until I bought the cab."

From this evidence the jury was authorized to find: that Chester Ellis purchased the automobile on Monday, October 7, 1946, from Leonard Durham, and entered into a parol, retention-of-title contract of purchase and sale with Earl Ellis on Saturday, October 12, 1946; that the contract price was $1400; and that Earl Ellis made a partial payment of $600 to Chester Ellis, using a check drawn by National Discount Company in that amount, payable to Earl Ellis and endorsed by Earl Ellis and Chester Ellis and that Chester Ellis received the money from the check; but that the automobile had, at no time prior to the execution of the mortgage with National Discount Company, been in the possession of the mortgagor, Earl Ellis, with or without the permis-

sion of Chester Ellis. And the evidence further authorized a finding that Chester Ellis did not know of nor acquiesce in Earl Ellis' mortgaging the automobile, nor did he do anything whereby National Discount Company was misled or deceived as to the ownership of the automobile. In other words, the jury was authorized to find that the mortgage from Earl Ellis to National Discount Company was executed at a time prior to the agreement between Earl Ellis and Chester Ellis; and that, under the terms of the agreement between Earl Ellis and Chester Ellis, Chester Ellis was to retain title to the automobile until full payment of the purchase-price. "In order for the lien of the mortgage to attach upon the property, title must have been in the mortgagor when the mortgage was executed, or he must have had possession then so as to raise the presumption of title. *Butt* v. *Maddox*, 7 *Ga.* 495; *Gunn* v. *Jones*, 67 *Ga.* 398." *Morris* v. *Winkles*, 88 *Ga.* 717 (15 S. E. 747). "A judgment creditor whose lien antedates the contract of sale is not one of the 'third parties' referred to by the law regarding conditional sales, as embodied in section 3318 of the Civil Code [Code, § 67-1401]." *American Law Book Co.* v. *Brunswick &c. Co.*, 12 *Ga. App.* 259 (77 S. E. 104), and citations. If National Discount Company dealt with Earl Ellis prior to the agreement between Earl Ellis and Chester Ellis, its mortgage did not take effect then or thereafter as a valid, subsisting lien upon the property it purported to cover (*Hogg* v. *Fuller*, 17 *Ga. App.* 442, 87 S. E. 760) ; and it is no ground of complaint on the part of the defendant that the agreement between Chester and Earl Ellis was not recorded. See *Conder* v. *Holleman*, 71 *Ga.* 93. As between Chester Ellis and Earl Ellis the title to the automobile remained in Chester Ellis, and in this action of trover the court did not, under the circumstances of this case, err in overruling the motion for a new trial.

*Judgment affirmed. Sutton, C. J., and Parker, J., concur.*